**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TILEBAR, formally known as SOHO STUDIO CORP, LLC, | |
| Plaintiff, | Case No.:  1:22-cv-03823(PKC)(RML) |
| v. | **DECLARATION OF JESSICA ARMSTRONG IN OPPOSITION TO PLAINTIFF'S ORDER TO SHOW CAUSE** |
| GLAZZIO TILES, formally known as DEUTSCH IMPORTS, LLC; GABRIELLE VONRUMPF; and JESSICA ARMSTRONG, | |
| Defendants. | |

**JESSICA ARMSTRONG**, of full age, hereby declares the following under penalty of perjury:

1.      I make this Declaration in opposition to Plaintiff's Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction.  I have personal knowledge of the matters set forth herein and can testify thereto if called upon to do so.

2.      Since June 7, 2022, I have been VP of Brand and Marketing at Defendant Glazzio Tiles.  Prior to May 23, 2022, I was Creative Content Director for Plaintiff TileBar.  I had been an employee of TileBar since December 2020, when I was originally hired as an Inside Sales Representative.

3.      I never worked for TileBar as an Inside Sales Representative, however.  On my first day at TileBar, I was immediately transferred to the position of Marketing Project Coordinator. During the entire course of my tenure with TileBar, I worked almost exclusively only in generating marketing materials and with information that was part of the public face of the company.  As discussed in more detail below, I did not have access to information that would be considered confidential or proprietary, such as customer information, pricing, profit margin calculations, tile

1

vendor agreements.  The only exception was that I was on a few occasions asked to prepare materials for in-house use and for business-to-business presentations.  I had general knowledge of the business and its units, all of which was generally known within the company and in the competitive marketplace.

4.      For the entire length of my employment with TileBar, I worked remotely.  This meant I was able to work from any location where I had access to my computer and internet access that was sufficiently fast and secure to access TileBar's remote desktop server, when necessary.

5.      For the most part, I performed my work for TileBar from my home in Tulsa Oklahoma, but occasionally would travel to work at TileBar's offices in Inwood, New York or elsewhere.

6.      During my tenure at TileBar, my supervisor, Erica Puccio, was repeatedly abusive to the staff reporting to her, including me, and often engaged in behavior that made my continued employment there unacceptable, such as gossiping about other employees, dishonesty, manipulation, disparaging other employees in front of their superiors within TileBar, and inappropriate personal behavior, all activities that were well documented by both myself and other TileBar employees with Human Resources.

7.      I made known on repeated occasions to Tilebar executive management and they did nothing to address the behavior of Ms. Puccio that had any positive impact. Subsequent to those interviews, Ms. Puccio increased her harassing behavior against me, ostensibly in retaliation for my participation in the HR process.

8.      I requested to be reassigned to a different supervisor months before my resignation and was told in March 2022 that this was to be granted. I was also told by Nelson Goodman, Chief Development Officer, in April 2022 that they felt that they had undervalued my contribution to the

company and they were considering me for a C-Suite level role and more compensation. However, when I attended a meeting on May 17th at TileBar at their Inwood location, I was informed that I would still be working under Erica Puccio and the following day she proceeded to make disparaging comments about how I worked for her and that I was nothing to the company. The following day, May 18th, 2022, I informed Nelson Goodman that I couldn't continue with TileBar and he requested that I take a few days to think about it.

9.      On May 20th, 2022, I sent it my resignation to Nelson Goodman, Kerri DiGirolamo, and Erica Puccio with my last requested day to be May 31st but with the offer to extend if necessary to finish up outstanding projects.

## MY EMPLOYMENT WITH TILEBAR

10.     I was introduced to TileBar by Co-defendant Gabrielle vonRumpf, who was hired as an employee of TileBar several months before I was.

11.     Upon my first day working with TileBar, it was required that I sign several documents.

12.     I believe that among these documents was an acknowledgement that I had received and reviewed TileBar's employee handbook.

13.     At the time it was requested that I sign this document, I had not yet received any employee handbook.

14.     My responsibilities at TileBar included such activities as copywriting, graphic design and coordination of the implementation of marketing plans, with the majority of my work concentrated the copy for product descriptions and e-commerce campaigns.

15.     I often used specialized software that was not initially provided to me by TileBar (e.g., Microsoft Office Suite, Adobe's suite of products, including Photoshop, Illustrator, and

3

InDesign) and which I personally licensed. Since the provided TileBar computer did not provide the necessary software and hardware to complete my assigned tasks, I worked on my local computer, which must be powerful enough to run these graphic programs and generate the marketing assets that TileBar requested of me.   The programs do not work effectively when using a remote computer.

16.     TileBar was aware of, and condoned, this arrangement. I also spoke with IT on different occasions about my inability to access the remote server and the fact that I could not efficiently use their company-provided computer.

17.     In fact, TileBar's own IT department installed the ability to access TileBar's remote desktop server on my personal computer.  This remote server access enabled me to obtain the documents from TileBar's files that were necessary to perform my duties.

18.     The personal laptop I used to complete my projects to TileBar is an HP Envy running Microsoft Windows.

19.     I do not own or operate a Macintosh computer but believe that other content creators with whom I have collaborated with or from whom I have received files or other assets in connection with my work at TileBar might use Macintosh computers.

20.     Likewise, individuals at TileBar were aware that I needed to use my personal Google Drive (as did others) to transfer these files among others at TileBar. This use of my personal drive continued until TileBar established a uniform policy of transferring files by providing access to Microsoft-branded software.

21.     At no point during my employment with TileBar did I access or attempt to access any proprietary customer lists or confidential pricing information, nor did I ever participate in strategic business decisions, or have direct access to any customer of TileBar.

**Glazzio Tiles Hires For Expansion of Commercial Segment**

22.     Glazzio Tiles is a well-known company within the industry.

23.     Even prior to the date TileBar alleges Ms. vonRumpf applied for a position with Glazzio Tiles, it was an "open secret" within the industry that Glazzio Tiles was interested in expanding their commercial specification market and that it would be hiring for an employee to lead such an effort.

24.     By February of 2022, I became aware that Ms. vonRumpf was interested in a position at Glazzio Tiles. At this time, I spoke with Jeremy Salomon about this and we discussed the Glazzio job as being a good fit for Ms. vonRumpf. He told me that he strongly suggested that Ms. vonRumpf needed to find another job due to the fact that Matthew Waas personally did not like her and was purposefully cutting her out of important national account business.

25.     Jeremy Salomon also informed me that the recruiter had reached out to him and that she had an initial interview with the company. He also stated that Glazzio wasn't a big enough company for him but that Ms. vonRumpf may want to pursue it.

26.     During this time, Ms. vonRumpf approached me about potentially talking to Glazzio for a marketing position since they are wanting to expand business and would need the type of services that I could offer.

27.     I then spoke to Jeremy Salomon in confidence about the potential of working for a company like Glazzio, since I knew that he was aware of the position and situation, compared to staying with TileBar to explore new opportunities without Erica Puccio as a direct supervisor. His opinion was that I was valued at TileBar, but that whatever position I would take within the TileBar would result in disaster since Erica Puccio would personally come after me for "leaving her team" and "making her look bad".

28.     Around the same time, I also learned that Ms. vonRumpf was going to visit TileBar's offices in New York in March of 2022, I suggested to my supervisor at the time, Erica Puccio, that I also visit TileBar's offices during this time so that I could potentially save money and stay with Ms. vonRumpf at her hotel since it was encouraged that I come into the office at least once per quarter.

29.     At the time I suggested my visit to TileBar's New York offices, I did not have any job interviews scheduled with Glazzio Tiles or any other potential employer.

30.     After Ms. Puccio suggested I visit TileBar's New York offices sometime later in the year rather than March, and understanding that the terms of my employment allowed me to work remotely from anywhere, I chose to travel to New York anyway at my own expense.

31.     Although I understood that my presence in New York was upon my own decision, I nevertheless informed TileBar of my plans to visit and spent time meeting with my team over lunch, also at my own expense.

32.     Upon learning that I was in New York, Eli Mechlovitz, TileBar's CEO, suggested that we meet in person on March 29, 2022 at the Inwood, NY location to discuss a new role that would have me reporting to someone other than Erica Puccio.

33.     During this visit to Inwood, I had a discussion with Nelson Goodman about the issues that both myself and other team members had experiences with our supervisor, Erica Puccio, and how I was interested in staying on with the company but could only do so if I did not directly report to Erica Puccio or Matthew Waas.

34.     For this meeting I traveled to and from TileBar's Hoover Street address.  As this meeting was requested of me by TileBar, the costs of travel to this meeting were the only expenses for which I sought reimbursement from TileBar.

35.     After Ms. vonRumpf's meeting with representatives of Glazzio Tiles in New York, Ms. vonRumpf informed me that those representatives were interested in meeting with me as well since I was in the area.

36.     While in New York, I met with representatives of Glazzio Tiles on the afternoon of March 30th and discussed the possibility of them hiring me.

37.     As is typically expected in a job interview, I spoke with representatives of Glazzio Tiles about my responsibilities and experience in my then-current position.  However, at no point did anybody at Glazzio Tiles seek, nor did I divulge, any information about TileBar that had not already been released to the public. The discussions that occurred with Glazzio were conceptual and general.  They included suggestions about how to implement a marketing plan and were based entirely on my own experience, not information that was specific to any particular company, including TileBar, and most certainly did not include any information about TileBar that was not already public.

38.     Given that my experience is in design and creating content for companies, I did show some samples of my previous work to representatives of Glazzio Tiles that had been prepared as creative content portfolio examples outside of the tile industry. Some of these samples did include materials I had created for TileBar, but they did not include any design elements that had not already been released publicly.

39.     After this initial meeting, I again contacted Mr. Salomon to ask his opinion about this type of move and how it would compare to staying at TileBar.

40.     I was informed that Glazzio Tiles was interested in meeting with Ms. vonRumpf again after this initial meeting in New York and as part of this second interview, and as is typical for second job interviews, Glazzio Tiles made it clear that it was interested in finding out more

about the efforts and ideas that Ms. vonRumpf and I would be able to bring to our respective positions.

41.     In connection with these secondary interviews, Ms. vonRumpf requested that I assist with the creation of a presentation slide deck in favor of our candidacies.

42.     Mr. Salomon was aware that we were preparing such a presentation.

43.     Neither Mr. Salomon, nor anybody else from TileBar, tried to prevent us from preparing for our interviews, from preparing such a presentation for any interview, or told us that TileBar believed it was disallowed under the terms of our employment.

44.     In fact, while we were all in attendance at the HD Expo trade show in Las Vegas in April 2022, Mr. Salomon told me that TileBar was aware that Ms. vonRumpf was interviewingfor another position, but that TileBar was "not going to do anything" to prevent her from pursuing or accepting such a position.

45.     I assisted in the design and organization of the presentation slide deck that accompanied Ms. vonRumpf's later interview with Glazzio Tiles.

46.     I did not use any confidential, proprietary, or trade secret information or any materials or tools belonging to Tile Bar in the creation of this slide deck.

47.     I also provided some suggestions and estimates that were included in the slide deck, including estimated salaries for certain positions, such as marketing coordinator and sales representative.  I estimated salaries based upon the typical "industry standard" for these types of professionals and these estimates were derived from my personal knowledge as to my own compensation for these types of roles, conversations I had with personal contacts who are not related to TileBar, and easily accessible online data.  I did not use any documents, materials, or information belonging to TileBar in providing these suggestions or estimates.

48.     The presentation also included other high-level suggestions to develop and increase customers, including suggestions that Glazzio Tiles:  make their packaging and other brand assets more attractive, hire sales representatives, print brochures and presentations, identify target customers, develop pricing programs, have strong relationships with suppliers, give customers a peek into the manufacturing process by providing tours, and move into new markets.

49.     I understand that TileBar contends that these suggestions constitute TileBar's "trade secrets."

50.     As a marketing professional and content creator, I find such claim to be preposterous.  These suggestions are already put into practice by countless retailers, and companies that do not, in the least, consider each of these marketing tactics to be the exception and not the rule.

51.     It is also my understanding that, absent a binding agreement to the contrary, being an employee of one company does not prevent me from considering employment with another company and discussing with them their business needs and my skills and expertise upon which I have built my career.

52.     Throughout the interview process with Glazzio Tiles, and the entire time since, I never divulged any confidential information belonging to TileBar, used any TileBar property or assets for my own benefit, told or otherwise attempted to convince other employees of TileBar to leave TileBar, or attempted to make any known customers or suppliers of TileBar to discontinue its relationship with TileBar and to instead contract with Glazzio Tiles or any other company.

## My Decision to Leave TileBar

53.     Although I was interested in a potential position with Glazzio Tiles, my decision to resign from TileBar was not contingent on an offer from Glazzio Tiles.

54.     In fact, at the time I informed TileBar of my resignation, I only had a verbal discussion with Glazzio that expectations on salary and duties could align. I did not yet have an officialjob offer from Glazzio Tiles

55.     Although I had been successful in my position at TileBar for over a year, by January 2022, I began to consider other offers of employment.

56.     This interest did not grow from a desire to make more money or compete with TileBar, but instead grew out of my frustration from the inaction of TileBar's human resources department upon reports of the harassing and demeaning conduct from certain managers that I witnessed firsthand and against my colleagues.

57.     Because of this behavior, I sought the counsel of several individuals at TileBar, including Mr. Salomon, Dee Dee Tsamoutalis (who, at the time, was responsible for TileBar's human resources department), and Mr. Mechlovitz.

58.     Mr. Mechloviz suggested he and I discuss these concerns over Zoom, during which I described the situation, told him I did not desire to cause any hardship for TileBar or my team, and asked whether there would be any other department within TileBar where I could be of use.

59.     Mr. Mechloviz offered several suggestions, including suggesting that I could be a good fit for a position in TileBar's "marketplace" department.

60.     The conversations about this potential move continued over several meetings, including during the March 29, 2022 meeting at TileBar's Hoover Street addresses, while I was in New York.

61.     Ultimately, however, I decided I no longer desired to work at TileBar and gave my resignation notice on May 20, 2022.

62.     Because the time between my resignation notice and anticipated last day was less than the traditional "two weeks' notice," I anticipated that TileBar may have wanted me to stay on longer to help with a transitional period.  I offered to extend this time, and was prepared to extend my employment, if asked.

63.     At this time, I had no job offer at any other employer.

64.     Nevertheless, I understand that Plaintiff has alleged individuals at TileBar became to believe on Monday, May 23, 2022, that I had been offered, and accepted, a position with Glazzio Tiles.

65.     Because of this mistaken belief, TileBar, through Kerri DiGirolamo, informed me that my employment there was terminated immediately.

66.     When asked why they terminated my employment immediately, Ms. DiGirolamo repeatedly refused to respond.  I have never been given an answer as to why my employment was terminated prematurely.  A true and accurate copy of my communications with Ms. DiGirolamo regarding this request is attached hereto as Exhibit A.

### My Return of TileBar Property

67.     I understand that TileBar alleges that a perceived delay in my returning of TileBar property is indicative of an effort on my part to conceal a "misappropriation scheme." There is no basis for this accusation.

68.     In reality, any perceived delay appears to be due to a combination of miscommunication, technical difficulties, and a prioritization of avoiding disruptions to TileBar's business.

69.     On the day I was prematurely terminated from TileBar, I also was requested via telephone by Ms. DiGirolamo to return electronic files and the TileBar-issued laptop to TileBar.

She informed me that I was to receive packing materials and instructions on how to return the laptop.

70.     This request was iterated in an email from Ms. DiGirolamo on May 24, 2022, asking that I return all work product "at [my] earliest convenience."  A true and complete copy of this email from Ms. DiGirolamo is attached hereto as Exhibit B.

71.     Knowing that my colleagues at TileBar were waiting for materials that I was preparing at the time of my termination, my first priority was to prevent any business or workflow disruptions by informing my colleagues that I had been terminated and let them know I no longer had access to the necessary files to finish the work they were expecting, including Mr. Salomon.

72.     Although none were ultimately requested of me, I offered to and was prepared to provide any working files necessary to prevent any disruption to on-going projects.  I later began compiling any TileBar files in my possession in order to return them to TileBar.

73.     After being told on May 23rd that I would receive further instruction on how to return my TileBar-issued laptop, I received packing materials to ship the laptop a week and a half after my termination, on June 1, 2022, but did not receive any instruction as to where or how to return the laptop.

74.     The same day, I requested additional instruction from Ms. DiGirolamo on how to return the laptop via email.  A true and correct copy of this email is attached hereto as Exhibit C.

75.     I did not get any initial response to this email.

76.     On June 2, 2022, I received yet another email from Ms. DiGirolamo inquiring why I had not yet returned the laptop.  Although she later claimed she never received my email requesting shipping instructions, this email contained the requested shipping instructions to overnight the laptop.

77.     I shipped the laptop back to TileBar the same day and sent it to arrive as soon as possible, as requested.

78.     At the same time, I was trying to return the electronic materials I had in my possession via a "WeTransfer" link, as Ms. DiGirolamo had requested.

79.     After encountering technical delays requiring me to restart the transfer several times and needing to wait for the transfer to finish until late into the night, the transfer via WeTransfer was ultimately also provided on June 2, 2022.

80.     I have files on my own computer from TileBar, but they do not contain anything that could be considered confidential or proprietary.  I have accessed a limited number of those files for personal reasons, including work on my own portfolio.  The computer that I use is available and I have no objection to submitting it for examination.

### TileBar's Requested Relief

81.     I am currently an employee of Glazzio Tiles. I do not have any other employment.

82.     My compensation from my position at Glazzio Tiles constitutes the vast majority of my regular income.

83.     I understand that TileBar is seeking an order preventing Glazzio Tiles from continuing to employ me.

84.     Without being able to continue in my current employment, I will face an obvious and substantial financial hardship.

85.     I never signed any agreement with TileBar that prevented me from accepting employment with Glazzio Tiles, any other competitor of TileBar, or any other employer whatsoever.

86.     I am unaware of any promise, policy, or requirement that prevents me from continuing in my position at Glazzio Tiles.

87.     I have satisfied TileBar's every request during and after my employment and during my term of my employment gave TileBar not only notice of, but also information regarding the substance of my conversations with, Glazzio Tiles--without receiving any objection from TileBar that I was prohibited from accepting employment with Glazzio Tiles.

88.     In light of this, TileBar's requested relief must be seen for what it is: oppressive, unnecessary, and entirely unwarranted.

89.     Accordingly, I respectfully ask the Court to deny the relief TileBar seeks in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed On:  July 11 , 2022                      By: _____
Tulsa, Oklahoma                                              Jessica Armstrong

2377700_1

14

# Exhibit A

**From:** Jess Armstrong <jessarms@gmail.com>
**Date:** May 24, 2022 at 9:24:11 AM CDT
**To:** Kerri DiGirolamo <kdigirolamo@sohostudiocorp.com>
**Subject: Re: UKG Login**

Thank you. Can you please send me in writing why you terminated my employment yesterday?

Sent from my iPhone

> On May 24, 2022, at 9:04 AM, Kerri DiGirolamo <kdigirolamo@sohostudiocorp.com>
> wrote:

Jess,

Attached is a copy of your last paystub. Your benefits end as of your last day of work.

Best Regards,

**Kerri DiGirolamo**
Vice President, Human Resources
Soho Studio LLC / TileBar
718-677-8453 ext. 136
Office – 15 Hoover St, Inwood, NY 11096
Warehouse – 800 Coopertown Rd, Delanco, NJ 08075

**From:** Jess Armstrong <jessarms@gmail.com>
**Sent:** Tuesday, May 24, 2022 10:00 AM
**To:** Kerri DiGirolamo <KDiGirolamo@sohostudiocorp.com>
**Subject:** Re: UKG Login

Can you please send a copy of my last paystub, a copy of my benefits and when they
expire, and an official letter explaining why you chose to terminate me earlier than I
gave my notice for.

Thank you,

Jess

Sent from my iPhone

> On May 24, 2022, at 8:43 AM, Kerri DiGirolamo
> <kdigirolamo@sohostudiocorp.com> wrote:
>
> Hi Jess,
>
> You will be unable to access your UKG profile now that you are no
> longer with the company.  Please let me know what you need and I will
> forward it to you.
>
> Best Regards,
>
> **Kerri DiGirolamo**
> Vice President, Human Resources
> Soho Studio LLC / TileBar
> 718-677-8453 ext. 136
> Office – 15 Hoover St, Inwood, NY 11096
> Warehouse – 800 Coopertown Rd, Delanco, NJ 08075
>
> **From:** Jess Armstrong <jessarms@gmail.com>
> **Sent:** Monday, May 23, 2022 9:15 PM
> **To:** Kerri DiGirolamo <KDiGirolamo@sohostudiocorp.com>
> **Subject:** UKG Login
>
> Can you please send me the login page for UKG? All of my links went
> through the company.
>
> Thank you,
> Jess Armstrong

# Exhibit B

**From:** Kerri DiGirolamo
**Sent:** Tuesday, May 24, 2022 12:21 PM
**To:** 'Jess Armstrong' <jessarms@gmail.com>

**Subject:** Return of Company Assets
**Importance:** High

Jess,

Reference is made to the Company's Employee Handbook Addendums which you acknowledged on September 7, 2021.  Copies of your Acknowledgement and the Employee Handbook Addendum are attached for your reference.

It has come to our attention that you have in your possession "Work Product" which as per the "Proprietary Rights, Work Product, Intellectual Property" section of the Confidentiality, Security, Intellectual Property and Exit Obligations Agreement is considered the "sole and exclusive property of the Company."  As per the "Return of Company Property and Exit Obligations" section of this same Agreement, you are obligated to "return to the Company any and all Company property and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his employment by the Company" upon separation of an employee's employment.

That said, we are asking that you return all "Work Product" to the Company at your earliest convenience by using WeTransfer or Drop Box.  If you need assistance with the software previously mentioned while attempting to return this "Work Product" to us, please don't hesitate to reach out to me.  Thank you in advance for your cooperation.

Best Regards,

**Kerri DiGirolamo**

Vice President, Human Resources

Soho Studio LLC / TileBar

718-677-8453 ext. 136

Office – 15 Hoover St, Inwood, NY 11096

Warehouse – 800 Coopertown Rd, Delanco, NJ 08075

# Exhibit C

**From:** Jess Armstrong <jessarms@gmail.com>
**Date:** June 1, 2022 at 4:10:01 PM CDT
**To:** Kerri DiGirolamo <kdigirolamo@sohostudiocorp.com>
**Subject: Re: FW: Return of Company Assets**

Hi, Kerri -

I received the box to ship back the laptop this afternoon. Do you have any instructions or shipping label to ship the laptop back?

As to the other items, any work that I performed for TileBar was either uploaded or shared through Wrike, WeTransfer, or email. I will send over any other working files by next week.

Thank you.

Jess Armstrong
(918) 230-7756